830 So.2d 1205 (2002)
AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA
v.
Oliver BOOTH. Mercury Finance Company of Mississippi, Inc.
v.
Oliver Booth.
No. 2000-IA-00844-SCT.
Supreme Court of Mississippi.
November 21, 2002.
*1206 W. Scott Welch, III, Jackson, Markham R. Leventhal, Miami, FL, Roland C. Goss, Washington, DC, Robert M. Frey, Jackson, William McDonough, Gulfport, Richard L. Yoder, Anthony L. Thaxton, Laurel, attorneys for appellants.
Lawrence E. Abernathy, III, Laurel, attorney for appellee.
EN BANC.
COBB, J., for the Court.
¶ 1. On February 26, 1998, Oliver Booth filed suit against Mercury Finance Company of Mississippi (Mercury) and American Bankers Insurance Company of Florida (American Bankers) in the Jones County Chancery Court, Second Judicial District, seeking damages for "economic loss incurred as a result" of American Bankers' alleged misdeeds ("including attorney's fees and legal expenses"), tort damages and punitive damages: the whole not to exceed $74,000. Booth claimed that Mercury, as American Bankers' agent, singled him out for unfair and fraudulent treatment, and treated him differently than it has treated its other customers, regarding an insurance policy he had purchased.
¶ 2. After partial discovery, Booth requested and was granted leave to amend his complaint, adding, inter alia, claims for breach of contract, breach of the duty of good faith and fair dealing, and breach of fiduciary duty, to his initial claim of fraud in the inducement. He also raised the dollar value sought to $75,000, just under 28 U.S.C. § 1332's amount-in-controversy requirement. Booth further prayed for injunctive relief requiring Mercury and American Bankers to refrain from charging borrowers for insurance premiums prior to the date of issuance of the policy and charging premiums in excess of the amount provided by the policy.
¶ 3. In a second amended complaint, Booth added a claim of civil conspiracy, asserting that he, and others similarly situated, have paid an inflated amount for premiums and have been denied benefits specified in their insurance contract. In addition, Booth requested specific performance and restitution, seeking among other things:
damages incurred by the Plaintiff and all other Mercury Finance customers within the State of Mississippi for the overcharging of Installment Floater policy premiums, ...
damages incurred by the Plaintiff and all other American Bankers customers for the underpayment of legitimate claims arising from the Installment Floater policy, ... [and]
punitive damages payable to the Plaintiff and all other Mercury Finance and American Bankers customers within the State of Mississippi....
(emphasis added).
¶ 4. American Bankers responded with a motion to dismiss, asserting that the second amended complaint fails to state a claim, because it attempts to assert claims on a class action basis while Mississippi *1207 law expressly prohibits such claims. Mercury filed a similar motion to dismiss.
¶ 5. A hearing was held in March 2000. On April 5, 2000, without further explanation, the trial court denied both American Bankers' and Mercury's motions to dismiss. Nine days later, Mercury and American Bankers filed a motion to amend and certify the order for interlocutory appeal. At the hearing to address this motion to amend and certify, the chancery court refused to rule on the issue of certification, stating "I have indicated to you that I think the record needs to be further developed in order for the Court to make a decision on that issue."
¶ 6. Pursuant to M.R.A.P. 5(a), we granted Mercury and American Bankers permission to bring their interlocutory appeals, consolidated the appeals, and granted a request to stay the trial court proceedings pending the resolution of this appeal. Subsequently, Mercury and Booth filed a joint motion to dismiss Mercury from this interlocutory appeal, and that motion was granted. Thus Mercury is no longer a party to this action.
¶ 7. On interlocutory appeal, American Bankers raised three issues, which have been edited for purposes of discussion:
I. DID THE CHANCERY COURT ERR BY PERMITTING BOOTH TO PURSUE AN ACTION FOR DAMAGES ON BEHALF OF "ALL OTHER AMERICAN FINANCE CUSTOMERS" IN MISSISSIPPI?
II. DOES BOOTH HAVE "STANDING" AS A MEMBER OF THE CLASS HE SEEKS TO REPRESENT?
III. DOES THIS SUIT VIOLATE RIGHTS GUARANTEED BY THE UNITED STATES AND MISSISSIPPI CONSTITUTIONS?
¶ 8. Concluding the chancery court erred by permitting a class action for damages, we reverse and remand. Because the resolution of this issue is dispositive of this interlocutory appeal, we decline to address the other issues raised in this appeal.

FACTS
¶ 9. In March 1995, Oliver Booth bought a used GMC pickup for $2,700. He borrowed the money for this purchase from Mercury's branch office in Hattiesburg, entering into a combination promissory note and security agreement, with the truck as collateral. As part of this agreement, Booth purchased credit life and credit disability coverage from Gulfco Life (not a party to this suit) and automobile insurance from American Bankers.
¶ 10. Approximately five months later, in August 1995, Booth's truck was hit and wrecked when struck by a vehicle fleeing from the police. When Booth called Mercury to report the accident, he was informed that he had no coverage.
¶ 11. Mercury had mistakenly issued Booth the wrong type of insurancean Installment Floater Certificate of Insurance covering only personal property excluding automobilesinstead of the automobile insurance he thought he was purchasing. Apparently, at that time, Mercury did not even have a standard automobile policy it could offer to sell at the inception of a loan in Mississippi.
¶ 12. In May 1995, about two months after it issued the policy, Mercury discovered its mistake, canceled the American Bankers' policy, refunded the entire premium, and credited Booth's account. (The total cost of the property insurance was only $130.26 for the entire two years.) Although Mercury believed it had verbally notified Booth of the cancellation, Mercury *1208 was unable to produce any documentation that confirmed it had done so.
¶ 13. In October 1995, about two months after the accident, Booth traded in the wrecked truck as partial payment for a Thunderbird he purchased from another car dealer, Auto World. Later, Auto World paid off Booth's loan to Mercury.
¶ 14. Booth filed his initial complaint in 1998, and on January 6, 1999, Mercury admitted its mistake and tendered a settlement check in the amount of $3,925.74 to the registry of the chancery court. American Bankers issued two checks to Booth, one for $3,482.95 on April 9, 1999, and one for $2,825.21 on June 8, 2000. Both were mailed to Booth's attorney, along with a cover letter to Booth. These checks from American Bankers were issued without prejudice to any of Booth's rightsnot asking for any release or compromise of his claim for cashing the checks. Judging from Booth's deposition testimony, his attorney has never informed Booth of these offers, and Booth has not cashed the checks:
Q. So, you think they [American Bankers] should have paid twenty-seven hundred dollars or a little less than that?
A. Whatever was left on the truck.
Q. And if they'd paid that, you wouldn't have sued?
ATTORNEY ABERNATHY: Object to the form.
Q. Yes or no?
ATTORNEY ABERNATHY: I withdraw the objection.
A. Well, you know, if they would have done me right.
Q. Do you know if they've ever paid that?
A. Well, if they paid it, we wouldn't be in here.
Q. I'm sorry?
A. If they paid it, we wouldn't have been up in here.
Q. So, your answer is you don't think American Bankers has ever paid that claim?
A. Right.
Q. Do you know if they've ever offered to pay?
A. No.
Q. You don't know one way or the other?
A. No, unless they did with my lawyer.
Q. What would you do if they offered to pay it today?
ATTORNEY ABERNATHY: Object to the form of that question.
Q. You can go ahead and answer.
A. I'd have to get with my lawyer here-whatever my lawyer do [sic].
Q. Okay.
A. I trust him.
Q. But it's your testimony as far as you know, they've never offered to pay the claim?
A. As far as I know, unless they did it with my lawyer. I trust whatever hewhatever he got [sic] going.
(emphasis added).[1]

STANDARD OF REVIEW
¶ 15. When the issues presented on an interlocutory appeal are questions of law, this Court will review those issues de novo. Gant v. Maness, 786 So.2d 401, 403 (Miss.2001).

*1209 DISCUSSION

I. DID THE CHANCERY COURT ERR BY PERMITTING BOOTH TO PURSUE AN ACTION FOR DAMAGES ON BEHALF OF "ALL OTHER AMERICAN FINANCE CUSTOMERS" IN MISSISSIPPI?
A. The Ancient Bill of Peace
¶ 16. According to American Bankers, Booth argued in the trial court that "even if his complaint did not meet the requirements for class relief, he should be permitted to proceed via a `Bill of Peace' because the relief he seeks on behalf of the absent plaintiff class is `similar' to that provided by a Bill of Peace." American Bankers argues that the representative class action Booth is seeking to maintain bears no resemblance to the ancient bill of peace. Booth apparently has abandoned his bill of peace argument, failing to assert it on appeal; nevertheless, we will address this issue. Pub. Employees' Ret. Sys. v. Hawkins, 781 So.2d 899, 900-01 (Miss.2001) (review may "extend[ ] to the full scope of the interests of justice").
¶ 17. "The ancient bill of peace was a procedural vehicle employed when equitable relief was needed to prevent the hardship which would result from prosecuting or defending numerous actions at law." Leaf River Forest Prods., Inc. v. Deakle, 661 So.2d 188, 192 (Miss.1995). "While the label `bill of peace' may not have survived the adoption of the M.R.C.P., the chancery court's authority to grant substantive relief through equity remains viable and available." Id. The chancery court's equity jurisdiction may properly be invoked to enjoin a multiplicity of successive suits at law by the same plaintiff(s). Id. at 193. The chancery court may also exercise its equity jurisdiction to prevent a multiplicity of suits by joining all parties in one suit and determining the sole question upon which past, present, and future liability rests. Id.
¶ 18. In the case sub judice, Booth is attempting to represent absent, unknown class members who have not yet filed a suit. The ancient bill of peace was not a class action, but instead, a procedural device for joining a multiplicity of suits to avoid the hardship which would result from prosecuting or defending numerous actions at law. While the ancient writ remains viable under the chancery court's authority to grant substantive relief, though not under the same label, it cannot be used merely to multiply a single claim, as is the case here.
B. The Equitable Class Action.
¶ 19. Booth's suit, seeking an equitable class action in chancery court, is not a novel concept. Even prior to the adoption of the Rules, plaintiffs have sought class treatment for monetary damages against private entities under the auspices of injunctive or equitable relief. Each time this Court has rejected that experiment.
¶ 20. In one such case, "John W. Barrett brought a class action on behalf of himself and `all others similarly situated.'" Barrett v. Coullet, 263 So.2d 764, 764 (Miss.1972). The action involved the Joe Frazier-Muhammad Ali championship boxing match that was being televised via closed circuit at the Mississippi Coliseum in Jackson. Id. Barrett's suit claimed breach of contract and breach of implied warranty, seeking monetary damages, because of the poor audio and video reception of the telecast. Id. We first noted that "Mississippi has no statute setting forth guidelines for class actions.... However, class suits have been recognized in Mississippi *1210 as a matter of general equity jurisdiction." Id.
¶ 21. In Barrett, we warned that: "A suit on behalf of a class should be closely studied, carefully analyzed and permitted only in clear cases because by its very nature such an action deprives nonappearing parties of their separate day in court, of their right to a choice of remedy, and they are bound forever by the decision rendered." Id. at 766. We then discussed the prerequisites of an equitable class action: "(1) there must be an ascertainable class, and (2) there must be a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented." Id. Further, there must be (3) "a right of recovery based upon the same essential facts, and all of those on whose behalf the suit is brought must have an interest common or identical with that of the named plaintiff," and (4) there must be the absence of an "adequate and complete remedy at law." Id. In holding that Barrett was not entitled to maintain his suit as a class action, we stated:
It would be virtually impossible to "ascertain" the class that complainant asks to represent. How many ticket purchasers retained their ticket stub? What proof would be required of actual attendance at the Mississippi Coliseum? After all, those who bought tickets but were not able to attend the actual showing for various and sundry reasons suffered no damage. Then too, even some of those attending might feel that they got their money's worth in what they did see and hear and in relaxing and enjoying a time of fellowship with sporting friends. If this class action was permitted, then they would be deprived of their right to elect not to sue.
Id.
¶ 22. Two years later, this Court dealt with a situation even more closely related to the case sub judice. Four individual appellants asserted a class action purportedly representing "all policyholders in Mississippi whose policies were issued by Casualty, and whose insurance premiums were financed by Budget at alleged usurious rates of interest." Evans v. Progressive Cas. Ins. Co., 300 So.2d 149, 151 (Miss.1974). In applying the Barrett factors, we held:
Each appellant and each potential member of the purported class has associated with him a different set of facts and circumstances. Treating the matter as a class suit would confront the trial court with as many different sets of facts as there were members of the class. Such a procedure would require the chancellor to make separate fact findings and calculations because each of the alleged class members was a policyholder with a separate contract of insurance and related financing.... For each of the separate and distinct claims revealed by this record, each appellant has an adequate remedy at law. This being true, and there being present no community of interest in the questions of law and fact affecting the parties appellants sought to represent, the chancellor properly dismissed the bill.... Disposition of each claim would obviously require individual proof of the transactions which took place between each of the purported class members and Casualty and Budget. In all likelihood, there would have to be a separate hearing or mini-trial for each of such class members and the chancellor would be confronted with the necessity of deciding many individual questions because there were different facts pertinent to each alleged class member. We are unable to comprehend that any court armed with all the ingenuity of man, could cope with the complexities and difficulties as would *1211 result from a class action if allowed here. Our opinion is that trial of the many claims asserted in this suit as a class action must, from a practical standpoint, be viewed as unmanageable.
Id. at 152-53.
¶ 23. This Court went on to speak of the many potential problems and the possibility of abuse presented by allowing this sort of class action:
Defendants faced with the awesome threat of such expensive, unwieldy, and multi-faceted litigation would logically tend to buckle under and negotiate settlements they would not otherwise consider. Windfalls would accrue. Also the ugly spectre of legalized blackmail is more than a possibility in future cases should this Court relent from the prerequisites of class suit actions ... [C]lass actions go against the grain of "due process" and "equal protection of the law." Rules applicable to such actions must, therefore, not be broadened or relaxed but applied with consistency.[2]
Id. at 153.
¶ 24. Even prior to our adoption of the Rules, this Court did not look with favor on class actions and allowed them only under rare circumstances. Guthrie T. Abbott & Pope Mallette, Complex/Mass Tort Litigation in State Courts in Mississippi, 63 Miss. L.J. 363, 393 (1994). "In each case where class treatment was allowed by the Mississippi Supreme Court, plaintiffs sought injunctive or other equitable relief in chancery court against governmental entities." Id.
¶ 25. One such case was Brown v. Reeves, 129 Miss. 755, 92 So. 825 (1922), where taxpayers of Harrison County brought a bill in chancery court against members of the county board of supervisors to recover appropriations wrongly expended. Id. at 755, 92 So. at 825. The chancery court dismissed the bill, and we reversed and remanded, holding that under the law a taxpayer has the right to maintain a suit of this character. Id.
¶ 26. Another case was McKee v. Hogan, 145 Miss. 747, 110 So. 775 (1926), where a taxpayer, claiming he had no other adequate and efficient remedy, filed a bill seeking an injunction against the school district for misappropriation of public funds for an improper, unauthorized, and unlawful purpose. Id. at 747, 110 So. at 775. We held that "before a private citizen can resort to injunction to litigate public questions, he should show that he has applied to the proper parties without redress, and also that he invited other citizens to join with him in the litigation." Id. at 766, 779-80.
¶ 27. In sum, even if the equitable class action had survived the adoption of the Rules, which it did not, Booth's suit would fail because it neither meets the prerequisites of Barrett and Evans, nor is his complaint a taxpayer suit seeking injunctive or other equitable relief in chancery court against governmental entities.
C. Class Actions and the Mississippi Rules of Civil Procedure.
¶ 28. On May 26, 1981, we adopted the Mississippi Rules of Civil Procedure to *1212 govern all civil actions filed on or after January 1, 1982.
These rules govern procedure in the circuit courts, chancery courts, and county courts in all suits of a civil nature, whether cognizable as cases at law or in equity, subject to certain limitations enumerated in Rule 81; however, even those enumerated proceedings are still subject to these rules where no statute applicable to the proceedings provides otherwise or sets forth procedures inconsistent with these rules. These rules shall be construed to secure the just speedy, and inexpensive determination of every action.
Miss. R. Civ. P. 1. The Rules were fashioned after the Federal Rules of Civil Procedure, with at least one major differencewe omitted class actions: "Rule 23. Class actions. [Omitted]."
¶ 29. After the adoption of the Rules, it was unclear whether even the equitable class action in chancery court had survived. However, this Court answered that question in Marx v. Broom, 632 So.2d 1315, 1322 (Miss.1994): "In enacting the Rules of Civil Procedure, this Court intentionally omitted Rule 23, which would have covered class actions. The comments to the Rules clearly state: `Class action practice is not being introduced at this time.' This has not changed." Further, in the comment to the Rules, we articulated why we were not introducing class action practice at this time: "Few procedural devices have been the subject of more widespread criticism and more sustained attackand equally spirited defensethan practice under Federal Rule 23 and its state counterparts.... [N]o meaningful reforms have as yet been developed to render class action practice a more manageable tool." Miss. R. Civ. P. 23 cmt.
¶ 30. American Bankers insists that the intentional exclusion of Rule 23 was a conscious choice based upon the widespread criticism and unmanageable nature of class actions, and any procedure that permits a class to proceed should be disallowed or enjoined by this Court. Booth responds by claiming that he has not requested a class, but that, if the question presented is whether a class would be appropriate, the answer is yes.
¶ 31. Apparently undeterred by this contradiction, Booth's entire brief attempts to argue that the class action he is not requesting should be allowed to continue. Booth cites Tideway Oil Programs, Inc. v. Serio,[3] 431 So.2d 454 (Miss.1983), a post-Rules case, for the proposition that the limited equitable class action our courts allowed prior to the adoption of the rules is still a viable procedure, stating in his brief:

Tideway was a class action appeal from the Chancery Court in Adams County. Squarely presented before the Supreme Court was the question of whether the Chancery Courts of this state had the power to certify a class. This Court apparently took the position that the class action device was well founded and embedded in Chancery practice, and did not even address the class action issue on appeal. Rather, the Court resolved the question of whether the Chancery Courts of this state had the power to assess punitive damages, according to the same substantive laws as applied in our Circuit Courts.
¶ 32. The first problem with Booth's assertion is that neither he nor his attorney is clairvoyant, capable of ascertaining the "apparent position" of this Court concerning an issue that we have not addressed. *1213 In Tideway, we specifically stated that: "Other issues not reached in either Part I or Part II are left for decision in the appropriate lower court after presentation of proof." Tideway, 431 So.2d at 456. One issue we did not reach in either part of the opinion was "complainant's attempts to enforce the rights of other parties." Id. How Booth can determine that this Court's not addressing the issue of class action, revealed our "position" that the class action device was well founded and embedded in chancery practice, is certainly a mystery to us.
¶ 33. The second problem for Booth's argument is that Tideway was filed in October of 1980, over a year prior to the effective date of the new Rules, January 1, 1982. Tideway, 431 So.2d at 455. Booth is in effect arguing that a case filed prior to the effective date of the Rules, in which the Rules do not govern, where we did not address the issue of class action, is proof that the class action survived the adoption of the Rules. This argument needs no further response.
¶ 34. Even the chancellor, during the March 15th hearing, admitted that class actions are no longer permitted in Mississippi:
The Court: All right. That gets us back to the class action situation, where Mississippi has no class action rule.
....
The Court: How do you propose to bind all of these people that are going to be in this class if you don't process them in, each and everyone of them, say you've got to come to the courthouse in Jones County whether you want to or not, and if you don't show up you're going to lose your rights forever.
....
The Court: What I'm saying, though, is that as we speak today, Mississippi does not have a class action remedy which would protect a defendant.
Then, inexplicably, at the May 10th hearing on the motions to certify for interlocutory appeal, the chancellor allowed a class action to proceed:
The Court: ... If I find that ... [Booth's] position is correct, that there are [sic] a group of citizens of the State of Mississippi out there who have been wronged, then I think this Court has the authority to make it right for them. Whether they are parties to this lawsuit or not.
....
I believe if the Court finds that to be the truth, be the fact, that certainly the Court has the authority to protect those people by ordering a refund of the amount of premiums that they were overcharged.
¶ 35. This Court has explained the primary purpose behind the Rules and the discretion afforded the trial judge:
The primary purpose of procedural rules should be to promote the ends of justice; these rules reflect the view that this goal can be best accomplished by the establishment of a single form of action, known as a "civil action," thereby uniting the procedures in law and equity through a simplified procedure that minimizes technicalities and places considerable discretion in the trial judge for construing the rules in a manner that will secure their objectives.
Miss. R. Civ. P. 1 cmt.
¶ 36. While it is true that the chancellor has given considerable discretion in construing the Rules of Procedure, it is not true that the chancellor may rewrite the rules, or add a rule that was intentionally omitted. Booth claims he is not asking for a class action, but then argues that a class action would be appropriate. *1214 Booth claims that he is seeking specific performance and restitution, then requests damages for all American Bankers' customers, and punitive damages. "A court must look to the content of the pleading to determine the nature of the action." Arnona v. Smith, 749 So.2d 63, 66 (Miss.1999). "Substance is considered over form.... The label is not controlling." Id. Whatever label Booth wants to give it, this is a class action for monetary damages for breach of contract.
¶ 37. When the Mississippi Rules of Civil Procedure were adopted, Rule 23, Class Actions, was intentionally, not accidently, omitted. There were concerns that meaningful reforms had not yet been developed that would make class actions manageable. If and when we find those reforms have been developed, the rules may be amended. Until that day, the rule is that Mississippi does not permit class actions, even equitable class actions in chancery court. Because the resolution of this issue is dispositive of this interlocutory appeal, we need not address the remaining issues presented. Therefore, we reverse and remand[4] for further proceedings consistent with this opinion.

CONCLUSION
¶ 38. We reverse and remand with instructions that the chancellor release "all other American Bankers customers" from this suit and that he conduct further proceedings consistent with this opinion.
¶ 39. REVERSED AND REMANDED.
PITTMAN, C.J., SMITH, P.J., WALLER AND CARLSON, JJ., CONCUR. GRAVES, J., CONCURS IN RESULT ONLY. McRAE, P.J., DIAZ AND EASLEY, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION.
NOTES
[1] "A lawyer shall keep a client reasonably informed about the status of a matter...." Miss. R. Prof'l Conduct 1.4(a).
[2] See also Linda S. Mullenix, Abandoning the Federal Class Action Ship: Is There Smoother Sailing for Class Actions in Gulf Waters?, 74 Tul. L.Rev. 1709, 1709 (2000):

Since 1995, federal courts have articulated an increasingly conservative class action jurisprudence that has directed federal courts to stringently scrutinize proposed litigation and settlement classes ... [and] the Alabama, Louisiana, and Texas Supreme Courts, within the last eighteen months, have engaged in a substantial rethinking and retrenchment of their state class action jurisprudence. The high courts in these states now have recognized and applied this conservative federal jurisprudence.
[3] Unfortunately, this is literally the only case cited in Booth's entire brief, leaving this Court to wonder what legal authority he relies upon for his arguments.
[4] American Bankers' motion to transfer this case to circuit court is still pending in chancery court. However, the interlocutory appeal before this Court does not raise the issue of whether the chancery or circuit court properly has jurisdiction of this case. Thus, we do not address the issue, notwithstanding the fact that this Court has recently spoken regarding the issue of chancery vs. circuit jurisdiction. See U.S. Fid. & Guar. Co. v. Estate of Francis, 825 So.2d 38, 45 46 (Miss.2002); Lawrence County Sch. Dist. v. Brister, 823 So.2d 459, 460 (Miss.2001).